1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JEFFREY DONNELL ROBINSON,                    Case No.  1:20-cv-00980-HBK (PC)

12                  Plaintiff,                     ORDER GRANTING DEFENDANTS'
                                                   MOTION FOR SUMMARY JUDGMENT[1]
13        v.
                                                   (Doc. No. 73)
14
     L. MERRITT and C. CRYER,
15
                    Defendants.
16

17

18

19         Pending before the Court is Defendants L. Merritt and C. Cryer's motion for summary

20   judgment filed August 8, 2024.  (Doc. No. 73, "MSJ").  Plaintiff did not file any opposition.  (*See*

21   docket).  On October 15, 2024, Counsel for Defendants submitted a Declaration in Lieu of Reply,

22   certifying that he has not received any response from Plaintiff to the MSJ.  (Doc. No. 76).  For the

23   reasons discussed below, the Court grant Defendants' Motion because there is no genuine dispute

24   of material fact as to whether Defendants were deliberately indifferent to Plaintiff's serious

25   medical needs in violation of the Eighth Amendment.

26         ////

27   _____

28   [1] Both parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c)(1).  (Doc.
     No. 75).

# I.   BACKGROUND

## A.  Procedural History

Plaintiff Jeffrey Donnell Robinson is a former state prisoner proceeding pro se and *in forma pauperis* in his civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff proceeds on his First Amended Complaint.  (Doc. No. 25, "FAC").  On July 11, 2022, in response to the Court's June 23, 2022 screening order, Plaintiff voluntarily dismissed certain claims and defendants in his FAC, and the Court ordered service on Plaintiff's remaining Eighth Amendment deliberate medical indifference claims against Defendants Merritt, Cryer, and K. Phui.  (*See* Doc. Nos. 43, 44).  Defendants previously filed an exhaustion-based motion for summary judgment seeking dismissal of Defendant Phui due to Plaintiff's failure to exhaust his administrative remedies as to his claims against Phui.  (Doc. Nos. 53).  On May 24, 2023, the District Court granted the MSJ and dismissed Phui.  (Doc. No. 61).  On August 8, 2024, Defendants timely filed the instant motion for summary judgment (Doc. No. 74, "MSJ").  Plaintiff has not filed any opposition and the time to do so has elapsed.

## B.  Defendants' MSJ

Supporting their MSJ, Defendants submit: (1) a memorandum of points and authorities (Doc. No. 73); (2) a statement of undisputed material facts (Doc No. 73-2); (3) the declaration of Defendant C. Cryer, (Doc. No. 73-3); (4) the declaration of Defendant L. Merritt (Doc. No. 73-4); (5) the declaration of John W. Nam, Counsel for Defendants (Doc. No. 73-5); (6) the declaration of Louisa Garza (Doc. No. 73-6); and (7) the declaration of Peter N. Sfakianos, M.D. (Doc. No. 73-7).

## C.  Plaintiff's Opposition to Defendants' MSJ

Plaintiff filed no opposition to Defendant's MSJ.  (*See* docket).  Defendant served the MSJ on Plaintiff by First-Class Mail on August 8, 2024.  (Doc. No. 73 at 26-27).  The deadline for Plaintiff to file any opposition has long expired.  *See* Local Rule 230(l) (E.D. Cal. 2023).

# II.  APPLICABLE LAW

## A.  Summary Judgment Standard

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there to be a genuine issue of a material fact.  *See* Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

The court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and showed judgment to be appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  "[A] court ruling on a motion for summary judgment may not engage in credibility

determinations or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  A mere scintilla of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly supported summary judgment motion. *Anderson*, 477 U.S. at 252.  However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record" courts "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The Ninth Circuit has "held consistently that courts should construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).  While prisoners are relieved from strict compliance, they still must "identify or submit some competent evidence" to support their claims. *Soto*, 882 F.3d at 872.  Plaintiff's verified complaint may serve as an affidavit in opposition to summary judgment if based on personal knowledge, not merely belief, and it must set forth specific facts admissible in evidence. *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc); Fed. R. Civ. P. 56(e).

A complaint's conclusory allegations unsupported by specific facts, will not be sufficient to avoid summary judgment. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001).  Where, as here, a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts. *See* Fed. R. Civ. P. 56(e)(2).  A court may grant an unopposed or inadequately opposed motion for summary judgment if the supporting papers are themselves sufficient to warrant granting the motion and do not on their face reveal a genuine issue of material fact. *See Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any,

4

objections, and other papers filed by the parties.  The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of issuing these Findings and Recommendations.

### B. Eighth Amendment Deliberate Medical Indifference

Deliberate indifference to the serious medical needs of an incarcerated person constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  To maintain an Eighth Amendment claim premised on prison medical treatment, the prisoner must show that officials were deliberately indifferent to his medical needs. A finding of "deliberate indifference" involves an examination of two elements: the seriousness of the plaintiff's medical need (determined objectively) and the nature of the defendant's response (determined by defendant's subjective state of mind).  *See McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller,* 104 F.3d 1133, 1136 (9th Cir.1997) (en banc).  On the objective prong, a "serious" medical need exists if the failure to treat "could result in further significant injury" or the "unnecessary and wanton infliction of pain."  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).  On the subjective prong, a prison official must know of and disregard a serious risk of harm.  *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).  Such indifference may appear when a prison official intentionally denies or delays care, or intentionally interferes with treatment once prescribed.  *Estelle,* 429 U.S. at 104-05.

If, however, the official failed to recognize a risk to the plaintiff—that is, the official "*should* have been aware" of a risk, but in fact was not—the official has not violated the Eighth Amendment.  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 668 (9th Cir. 2021) (emphasis in original).  That is because deliberate indifference is a higher standard than medical malpractice. Thus, a difference of opinion between medical professionals—or between the plaintiff and defendant—generally does not amount to deliberate indifference.  *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  An argument that more should have been done to diagnose or

treat a condition generally reflects such differences of opinion and not deliberate indifference. *Estelle*, 429 U.S. at 107. To prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the chosen course "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk" to the plaintiff's health. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

Neither will an "inadvertent failure to provide medical care" sustain a claim, *Estelle*, 429 U.S. at 105, or even gross negligence, *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013). Misdiagnosis alone is not a basis for a claim of deliberate medical indifference. *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012). A delay in treatment, without more, is likewise insufficient to state a claim. *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). It is only when an official both <u>recognizes</u> and <u>disregards</u> a risk of substantial harm that a claim for deliberate indifference exists. *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc). A plaintiff must also demonstrate harm from the official's conduct. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). And the defendant's actions must have been both an actual and proximate cause of this harm. *Lemire*, 726 F.3d at 1074.

## III.  ANALYSIS

### A.  Allegations in Plaintiff's Operative Complaint

Plaintiff Jeffrey Donnell Robinson ("Plaintiff" or "Robinson"), a state prisoner, initiated this action by filing a pro se civil rights complaint under 42 U.S.C. § 1983. (Doc. No. 1). In his operative First Amended Complaint, Plaintiff alleges that various prison officials and medical staff at SATF, including Defendants Cryer and Merritt, delayed surgery for his fractured hip, resulting in prolonged pain and irreparable injury. (Doc. No. 25 at 6-25). Plaintiff asserts that Defendants made him "wait and wait, in pain subjecting him to . . . take medication longer than he has too [sic] for his right hip injury." (*Id*. at 6). Plaintiff alleges he has spent "2 years and 6 months waiting for surgery causing him injury after injury . . . [t]he inactions of the defendants has caused Plaintiff to be put in a wheelchair[.] [D]efendants failed to respond and did not[hing] at all to [address] Plaintiff's serious medical needs. Causing irreparable injury." (*Id*.).

As relief, Plaintiff seeks a declaratory judgment; an injunction ordering Defendants to provide him immediate surgery for his hip; nominal, compensatory, and punitive damages; costs of suit; and any other further relief the Court deems just and proper.  (*Id.* at 27-28).

**B.  Plaintiff's Failure to Oppose the Motion**

Plaintiff did not file an opposition to Defendant's MSJ, (*see* docket), nor did Plaintiff submit a separate statement of undisputed facts as required by Local Rule 260(a).  Where a party fails to oppose a motion for summary judgment, "Rule 56 is clear that although a court *may* deem facts admitted in the exercise of its discretion, it need not do so."  *Warkentin v. Federated Life Ins. Co.*, 594 F. App'x 900, 902–03 (9th Cir. 2014) (alteration in original); *see* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("[T]he court may choose not to consider [a] fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute").  A court, however, is not authorized to automatically grant summary judgment to a defendant solely because a plaintiff fails to oppose the motion.  *Cristobal v. Siegel*, 26 F.3d 1488, 1494–95 & n.4 (9th Cir. 1994); *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003).

Where, as here, a party does not challenge the facts asserted by the moving party, the non-moving party may be deemed to have admitted the validity of those facts.  *See* Fed. R. Civ. P. 56(e)(2).  Further, Local Rule 230(l) provides that the "[f]ailure of the responding party to file an opposition or to file a statement of no opposition may be deemed a waiver of any opposition to the granting of the motion and may result in the imposition of sanctions."  Thus, the Court may grant Defendant's unopposed motion for summary judgment if the supporting papers are themselves sufficient to warrant granting the motion and do not on their face reveal a genuine issue of material fact.  *See Gill Indus.*, 983 F.2d at 950.

**D. Undisputed Material Facts**

Defendants provide a statement of undisputed material facts.  (Doc. No. 73-2).  Each listed fact cites to sworn declarations, deposition testimony, and the First Amended Complaint.  (*See* generally *id.*).  Having reviewed the record, the undersigned finds the following facts to be material and undisputed, unless otherwise noted.

- Plaintiff Jeffrey Donnell Robinson filed his initial Complaint on July 15, 2020, and the operative First Amended Complaint ("FAC") on July 26, 2021.  (*See* Doc. Nos. 1, 25, 73-5 at 1 ¶ 2).

- Plaintiff is not currently incarcerated as he was released on parole in October 2020.  (Doc. No. 73-5 at 1 ¶ 3, *id*. at 56:9-58:12, 17:18-20.)

- Plaintiff brings this action under 42 U.S.C. § 1983, alleging that Defendants Cryer and Merritt were deliberately indifferent to Plaintiff's medical needs under the Eighth Amendment by either not effectively treating his pain or denying him surgery that was previously prescribed.  The events at issue in this case occurred between 2018 and 2021 at the California Substance Abuse Treatment Facility ("SATF"), located in Corcoran, CA. (*See* Doc. No. 25.)

- Defendant Cryer was the Chief Executive Officer (CEO) at SATF during part of the relevant time frame.  Cryer was CEO of SATF from July 2013 through March 2020. Cryer is not a medical doctor. He does not have a medical degree or license, and he cannot practice medicine, evaluate patients, prescribe treatment or medication, or otherwise make medical treatment decisions for any patient.  (Doc. No. 73-3 at 2 ¶¶ 4-5.)

- Defendant L. Merritt was a nurse practitioner at SATF during the relevant time frame. (Doc. No. 73-4 at 2 ¶ 3.)

- The FAC, filed on July 25, 2021, also named G. Ugwueze, K. Phui, and C. Nyenke.  On July 14, 2022, the Court issued an order dismissing Ugwueze and Nyenke.  (Doc. No. 44). This Court also summarily dismissed Defendant Phui because Plaintiff failed to exhaust his administrative remedies as to Phui.  (Doc. Nos. 57, 61).  The only remaining claims are Plaintiff's Eighth Amendment medical deliberate indifference claims against Merritt and Cryer.  (Doc. No. 41 at 10:20-28.)

- Medical staff at individual CDCR institutions, including SATF, do not have the authority to approve or deny hip-related surgical procedures, but instead must submit all requests for hip-related surgical procedures to the Statewide Medical Authorization Review Team (SMART) Committee at CDCR headquarters in Sacramento, California, which determines

whether the proposed surgery is medically indicated and the inmate meets the criteria for the surgery. (Doc. No. 73-4 at 2 ¶ 5.)

- Defendant Merritt has never had authority to schedule, approve, or deny surgeries for patients.  Her role in the Request for Service ("RFS") process is to medically evaluate patients like the Plaintiff, and if necessary and appropriate, submit a RFS to ensure that the patient is either being referred for an orthopedic surgery evaluation or advanced level of care treatment for an orthopedic condition, such as avascular necrosis of the right hip. (Doc. No. 73-4 at 2-3 ¶¶ 6-9.)

- Merritt first saw Plaintiff on December 5, 2018 to evaluate Plaintiff, who had been previously diagnosed with right hip osteoarthritis and chronic right hip pain.  Merritt physically examined Plaintiff and noted that Plaintiff's condition was stable.  Merritt noted Plaintiff's severe right hip osteoarthritis and lumbar spine osteoarthritis and that Plaintiff had a slight antalgic (limping) gait.  Merritt noted these conditions did not interfere with Plaintiff's activities of daily living (ADLs) and that Plaintiff had not fallen recently.  Merritt also reviewed Plaintiff's medical file, which indicated Plaintiff was waiting for a SMART form to be approved, so Merritt contacted Dr. Phui and asked Dr. Phui to complete the SMART form, which the doctor agreed to do.  (Doc. No. 73-4 at 4 ¶ 14.)

- Between December 2018 and January 2019, Dr. Phui ordered referrals to the SMART committee to evaluate whether Plaintiff should receive a right hip arthroplasty.  (Doc. No. 73-4 at 4-5 ¶¶ 15-16.)

- Merritt saw Plaintiff again on February 11, 2019.  While Plaintiff stated that his pain was increasing, he was ambulatory and able to move around with the assistance of a cane.  During this visit, Plaintiff denied having any barriers to daily living activities.  Plaintiff did not report any new health care concerns.  Merritt evaluated Plaintiff's need for pain medications.  She started Plaintiff on a course of Tylenol-codeine (Tylenol-3) pain medication.  Merritt noted that her assessment and plan was to continue the current plan of care, as well as continue to follow-up with the orthopedic specialist as needed.  (Doc. No.

73-4 at 5 ¶ 17.)

- On March 6, 2019, Merritt ordered a physical therapy evaluation and treatment for Plaintiff because of his issues with osteoarthritis, right hip weakness, and back weakness. (Doc. No. 73-4 at 5 ¶ 18.)

- On June 13, 2019, Plaintiff refused physical therapy. (Doc. No. 73-4 at 5 ¶ 19.)

- Merritt next saw Plaintiff on September 5, 2019.  Based on Merritt's examination, it appeared that Plaintiff's condition was stable and he was able to ambulate with the help of a cane.  Merritt offered Plaintiff a wheelchair to assist with mobility, but Plaintiff refused. Merritt advised Plaintiff that Dr. Phui had put in a referral for an orthopedic surgeon evaluation.  Merritt also provided a pain management plan, ordered follow-up x-rays, and ordered a physical therapy evaluation and treatment for Plaintiff.  Merritt informed Plaintiff that she had followed up on a RFS that had been submitted by Dr. Phui.  (Doc. No. 73-4 at 5-6 ¶¶ 20-21.)

- On October 8, 2019, Merritt saw Plaintiff again and noted that his condition was stable. Merritt did not observe any popping or clicking in Plaintiff's right hip.  Plaintiff was able to go from sitting to standing with ease.  During the exam, Merritt offered Plaintiff a wheelchair, which Plaintiff declined, stating he would use a walker.  Merritt again provided a pain management plan and ordered an orthopedic surgical evaluation because of Plaintiff's ongoing right hip pain with instability on long-distance ambulation, avascular necrosis, and a September 15, 2019 x-ray showing an old fracture of Plaintiff's right acetabulum with severe post-traumatic osteoarthritis.  Merritt also ordered a physical therapy evaluation and treatment to strengthen Plaintiff's gluteus and pelvic muscles to deal with his hip issues.  (Doc. No. 73-4 at 6 ¶ 22.)

- On October 28, 2019, Merritt submitted a RFS requesting an orthopedic surgery evaluation for Plaintiff because he had ongoing right hip pain noting his history of hip-related medical issues and Plaintiff's ongoing pain despite his use of over-the-counter Tylenol and nonsteroidal inflammatory (NSAID) medications.  (Doc. No. 73-4 at 6-7 ¶ 23.)

- On October 31, 2019, Plaintiff refused physical therapy and did not want to be rescheduled. (Doc. No. 73-4 at 7 ¶ 24.)

- On November 27, 2019, Merritt examined Plaintiff following a November 12, 2019 consultation with Dr. Hashemi, an orthopedic specialist.  Merritt again submitted a RFS on Plaintiff's behalf for a right total hip arthroplasty.  Merritt discussed the risks and benefits of a right total hip arthroplasty.  Merritt also conducted a physical examination, finding that Plaintiff's condition was stable and that he did not have any barriers to activities of daily living, but noted Plaintiff was using a wheelchair.  Merritt continued the plan of care and continued the plan for pain management.  Merritt advised Plaintiff that she would continue following up with orthopedic services to continue monitoring Plaintiff's right hip.  Merritt requested a CT scan of Plaintiff's pelvis to continue monitoring Plaintiff's condition.  (Doc. No. 73-4 at 7-8 ¶¶ 25-26.)

- On December 4, 2019, Merritt requested a CT scan of Plaintiff's pelvis to monitor and assess the Plaintiff's right hip issue.  (Doc. No. 73-4 at 8 ¶ 27.)

- As of January 2020, Plaintiff was able to walk and get to the dining hall if he was unable to walk with his cane.  He was able to bathe himself and get to medical appointments on his own.  (Doc. No. 73-5 at 98:13-19; 98:23-99:8.)

- On January 8, 2020, Merritt saw Plaintiff and conducted a physical examination.  Plaintiff denied any recent falls or barriers to his activities of daily living or medications, but Plaintiff was using a wheelchair full-time.  Plaintiff admitted he had refused physical therapy again because he did not feel it was necessary.  Once more, Merritt educated Plaintiff on the importance of complying with all medically prescribed treatments.  Plaintiff agreed to comply with the plan of care and acknowledged that he was aware of the importance of physical therapy.  Merritt advised Plaintiff that she had placed orders for physical therapy and a CT scan of his right hip.  (Doc. No. 73-4 at 8 ¶ 28.)

- On January 23, 2020, Merritt ordered a physical therapy consultation for Plaintiff so that he could be evaluated and treated as necessary.  Merritt noted that Plaintiff was now

11

amenable to physical therapy to strengthen his hip, as they had discussed on January 8, 2020.  (Doc. No. 73-4 at 8 ¶ 29.)

- On March 12, 2020, Merritt saw Plaintiff and conducted a physical examination, which showed that Plaintiff's right hip condition was stable.  Plaintiff denied having any issues with ADLs.  That same day, Merritt put in another RFS asking for orthopedic surgery for Plaintiff.  Merritt also evaluated and assessed Plaintiff's pain management.  Merritt notified Plaintiff that another RFS had been placed for an orthopedic evaluation of his ongoing right hip issues.  Merritt also discussed the plan of care with Plaintiff, which he agreed with.  Plaintiff's medical records indicate that he was approved for an orthopedic evaluation, but not surgery. (Doc. No. 73-4 at 8-9 ¶¶ 30-31.)

- On April 8, 2020, Merritt noted that Plaintiff's condition was stable.  Merritt ordered physical therapy to be scheduled as Plaintiff had recently been seen for physical therapy evaluation and treatment in March 2020.  (Doc. No. 73-4 at 9 ¶ 32.)

- On June 1, 2020, Merritt submitted a RFS for an orthopedic surgery evaluation for Plaintiff, noting Plaintiff's ongoing right hip issue.  (Doc. No. 73-4 at 9 ¶ 33.)

- On June 2, 2020, Merritt submitted a RFS for orthopedic surgery for Plaintiff.  Merritt also noted her efforts, along with others, to conservatively manage Plaintiff's pain, along with physical therapy, rest, and the use of a wheelchair.  Merritt also noted that Dr. Hashemi, an orthopedic surgeon, had recommended a right hip arthroplasty for Plaintiff.  (Doc. No. 73-4 at 9 ¶ 34.)

- On June 8, 2020, Merritt saw Plaintiff because of right hip pain.  Plaintiff admitted that he had been working in the kitchen pushing carts while sitting in his wheelchair.  Merritt conducted a physical examination of Plaintiff, which indicated he was stable.  Merritt discussed continuing pain management with Plaintiff, who refused any opiate therapy.  Merritt also reviewed Dr. Hashemi's June 1, 2020 note recommending right hip total arthroplasty.  Merritt thoroughly discussed the risks and benefits of completing the surgery with Plaintiff, including that there were no guarantees following surgery.  Plaintiff agreed with the plan of care and Merritt advised Plaintiff that a request for right total hip

arthroplasty again had been placed in his file.  Merritt also ordered outpatient physical therapy evaluation and treatment. (Doc. No. 73-4 at 9-10 ¶ 35.)

- On August 17, 2020, Merritt submitted another RFS on Plaintiff's behalf, requesting total hip arthroplasty of Plaintiff's right hip.  As with her prior requests, Merritt noted Plaintiff's ongoing right hip issue.  Merritt also noted her efforts, along with others, to conservatively manage Plaintiff's pain, along with physical therapy, rest, and the use of a wheelchair.  Merritt also noted that Dr. Hashemi had recommended a right hip arthroplasty for Plaintiff.  (Doc. No. 73-4 at 10 ¶ 36.)

- Following the August 17, 2020 visit, Merritt does not believe she saw Plaintiff again until May 17, 2021.  (*Id*. ¶ 37.)

- On May 17, 2021, Merritt again saw Plaintiff because of his complaints about ongoing right hip pain.  Merritt conducted a physical examination of Plaintiff, which showed that he was stable.  Plaintiff denied having any recent falls or altercations.  Merritt discussed continuing the same plan of care and pain management.  Merritt again put in another RFS for total hip arthroplasty of Plaintiff's right hip and advised Plaintiff about the request. (*Id*. ¶ 38.)

- On June 15, 2021, Merritt submitted a RFS requesting a follow-up orthopedic surgery referral.  Merritt again noted Plaintiff's need for a right total hip arthroplasty and referenced Dr. Hashemi's right total hip replacement surgery recommendation.  (Doc. No. 73-4 at 11 ¶ 39.)

- On August 18, 2021, Merritt saw Plaintiff.  Merritt conducted a physical examination, finding he was stable.  Plaintiff denied he had any barriers to daily living activities. Merritt encouraged Plaintiff to continue using a wheelchair for ambulation.  Merritt and Plaintiff also discussed Plaintiff's July 23, 2021 visit with Dr. Hashemi, where Dr. Hashemi noted that she had explained to Plaintiff that the best course of action for his avascular necrosis was removal of the failed hardware from a previous procedure.  During Merritt's visit with Plaintiff, Merritt discussed a treatment plan and also ordered pain

medication to continue to manage Plaintiff's right hip pain.  Merritt ordered x-rays of Plaintiff's hip to assess Plaintiff's ongoing hip issues.  (*Id*. ¶ 40.)

- Defendant's medical expert believes that at all relevant times, Merritt provided appropriate and reasonable medical treatment to Plaintiff in light of Plaintiff's medical history, symptoms, and ability to independently perform activities of daily living, and that her proposed course of treatment was consistent with the medical standard of care.  ((Doc. No. 73-7 at 4-5 ¶¶ 10-13, *id*. at 6-7 ¶¶16-17; Doc. No. 73-5 at 91:14-17.)

- At no point did Merritt refuse to see or treat Plaintiff.  (Doc. No. 73-5 at 72:13-16; 100:15-21; 101:5-6; 107:3-19.)

- Plaintiff is not a doctor and has no medical training or education, nor does he have experience treating patients.  (*Id*. at 108:5-11; *id*. at 108:16-19.)

- During the relevant time frame, Plaintiff was between 51 and 53 years of age.  For someone of Plaintiff's age, it is medically appropriate to wait as long as possible before having a total hip arthroplasty.  This decreases the need for a revision arthroplasty.  An individual in their forties or fifties is much more likely to require a revision arthroplasty, which has a much higher complication rate and is much more difficult to perform.  (Doc. No. 73-7 at 3-4 ¶ 9; *id*. at 5-6 ¶ 14.)

- Merritt, as a nurse practitioner, did not have control or responsibility, whether administratively or medically, over the timing of any surgical procedures.  Merritt did not have the authority to approve or schedule Plaintiff's right total hip arthroplasty, but she made numerous requests in order to get the surgery approved.  (Doc. No. 73-4 at 4-11 ¶¶ 14-41; Doc. No. 73-7 at 5-6 ¶ 14; Doc. No. 73-5 at 73:23-25; 101:7-18; 104:15-64:14; 107:3-5.)

- The COVID-19 pandemic restricted activities during the relevant time frame.  The Federal COVID-19 Public Health Emergency (PHE) declaration started on March 11, 2020, and ended May 11, 2023.  The PHE restricted elective surgeries, such as Plaintiff's desired right total hip arthroplasty, because it was deemed non-essential.  Despite the hold on elective surgeries and Merritt's lack of authority to approve an elective surgery, Merritt

continued to advocate for Plaintiff's candidacy for a right total hip arthroplasty. (Doc. No. 73-4 at 3 ¶¶ 10; Doc. No. 73-7 at 5-6 ¶¶ 13, 15; Doc. No. 73-5 at 97:10-13.)

- Merritt continued to see, evaluate, and treat Plaintiff throughout the COVID-19 pandemic. (Doc. No. 73-5 at 99:9-12; Doc. No. 73-4 at 8-11 ¶¶ 30-40).

- Defendants' medical expert found no evidence in Plaintiff's medical records that any delay in approving or obtaining the surgery caused any significant worsening of Plaintiff's underlying hip issue. Plaintiff's hip condition remained stable throughout the time Merritt saw Plaintiff, thus any additional time in approving and obtaining the recommended surgery during the relevant time frame was reasonable and justified. (Doc. No. 73-4 at 4-11 ¶¶ 11-40; Doc. No. 73-7 at 5-6 ¶¶ 13, 15).

- Following Plaintiff's release from incarceration, Plaintiff received additional medical evaluations and treatment for his right hip, including right hip replacement surgery on April 1, 2022, where the orthopedic surgeon who performed the procedure confirmed prior medical findings and did not encounter any complications that could be related back to the medical care Plaintiff received at SATF. (Doc. No. 73-7 at 7-8 ¶¶ 18-20; Doc. No. 73-5 at 65:16-24; 107:20-108:4.)

- Cryer was the Chief Executive Officer at SATF during part of the relevant time frame, between 2018 and March 2020. Among his responsibilities was oversight of inmate healthcare within SATF, determining whether any investigation or response is required, and delegating those responsibilities to clinical staff. This included oversight of CDCR staff who process healthcare appeals/grievances submitted by adult inmates regarding medical, dental, and mental health care services. (Doc. No. 73-3 at 2 ¶¶ 6-8.)

- Cryer reviewed inmate healthcare grievances at the institutional level. In order to come to a disposition, Cryer relied on the clinical expertise of those who had created the patient's plan of care and the determination of clinical staff who review and document clinical reviews at each stage of processing grievances. Cryer did not personally conduct investigations into inmate appeals or grievances relating to medical care. (Doc. No. 73-3 at 3 ¶¶ 10-14; *id*. at 5 ¶¶ 21-23.)

15

- Cryer has no medical training or experience, is not qualified to make medical decisions for inmates, has no authority to order medical staff to provide specific medical treatment or approve medical procedures and has never provided medical care to Plaintiff.  (Doc. No. 73-3 at 2-5 ¶¶ 4, 5, 7, 9, 13, 22-23; Doc. No. 73-5 at 60:14-16.)

- Plaintiff has never met or spoken to Cryer, nor did Cryer ever provide Plaintiff with any medical treatment.  Plaintiff admits that Cryer never told Plaintiff that Plaintiff was being denied hip surgery.  (Doc. No. 73-5 at 60:8-11; 61:14-21:11; 60:12-13; 64:11-13; 65:10-14; Doc. No. 73-7 at 8 ¶ 21.)

- Cryer's involvement in Plaintiff's case was limited to reviewing and responding to one of Plaintiff's inmate healthcare grievances, Healthcare Grievance Log No. SATF HC 19001347.  Cryer approved the institutional response denying Plaintiff's grievance after considering all the relevant information and finding that there were no issues to address.  (Doc. No. 73-3 at 4-5 ¶¶ 19, 21, 24; Doc. No. 73-5 at 64:18-65:4.)

- Cryer was no longer the CEO at SATF at the time that Plaintiff filed his second healthcare grievance, nor was he involved in the institutional level response to that grievance.  (Doc. No. 73-3 at 4-5 ¶ 20.)

**D.  Defendants' Proposed Expert Testimony**

Defendants seek to qualify Dr. Peter Sfakianos as an expert based on his education, background, training, knowledge, and experience, coupled with his review of Plaintiff's medical records.  (Doc. No. 73-7).  Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify if the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based upon sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

16

(d) the witness has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 requires that expert testimony be both "reliable and relevant" whether based on scientific, technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

Dr. Sfakianos has been licensed in California as a physician since 1982 and is board certified as an orthopedic surgeon. (Doc. No. 73-7 at 1-2 ¶ 2). He maintains a private orthopedics practice with a specialization in joint reconstruction of the knee, hip, and shoulder. (*Id*. at 2 ¶ 3). Sfakianos has extensive experience as an orthopedic surgeon in clinical, private practice, and military settings, including conducting more than 15,000 operative procedures. (*Id*. ¶ 4). He has also served as a referee physician, providing a controlling opinion in circumstances where a physician and medical examiner disagree. (*Id*.).

In formulating his opinions, Dr. Sfakianos relied upon his education, training, knowledge, and professional experience in the health care field, and reviewed the following materials: (1) the First Amended Complaint; (2) Plaintiff's medical records from his time in CDCR custody; and (3) Plaintiff's post-release medical records. (*Id*. at 3-4 ¶¶ 8, 10).

Dr. Sfakianos opines in relevant part that:

> [Defendant] Merritt, a nurse practitioner, provided standard conservative measures, as listed below, during the relevant time period. Standard conservative measures ensures that a medical provider abides by community standards of providing appropriate medical evaluations and treatment. Merritt's course of treatment to manage Plaintiff's medical condition and pain was treated in a medically appropriate way because it met the community standard of care. Everything I reviewed indicates that Merritt met the community standard of care for each event documented.
>
> Plaintiff was provided the appropriate conservative course of treatment, which included medical care during the events at issue included the use of nonsteroidal anti-inflammatory agents, participation in physical therapy, weight reduction, and the utilization of ambulatory aids. Furthermore, Merritt prescribed the appropriate pain management plan, along with the appropriate medication, which included the judicious use of opioids to treat Plaintiff's pain symptoms. Long-term opioid use is discouraged for musculosketal maladies, such as posttraumatic arthritis or primary osteoarthritis, which Plaintiff suffered from during the relevant timeframe. This course of treatment was medically acceptable under the circumstances and did not disregard an excessive risk to

1
2

Plaintiff's health. There was no risk to Plaintiff's health based on Merritt's medical treatment and evaluation.

3

(Doc. No. 73-7 at 4 ¶¶ 10-11).

4

Plaintiff does not challenge Dr. Sfakianos' qualification as an expert of his testimony

5

under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  The Court finds Dr.

6

Sfakianos' education, training, credentials, and experience qualifies him as an expert.  The Court

7

further finds Dr. Sfakianos' testimony set forth in his declaration both relevant and admissible.

8

Thus, the Court accepts Dr. Sfakianos' opinion as expert testimony under Federal Rules of

9

Evidence 702 as to whether the medical care Defendants provided Plaintiff was appropriate and

10

met the standard of care.

11
12

**E.  The Undisputed Facts Show Defendant Merritt Did Not Act with Deliberate Indifference to Plaintiff's Serious Medical Needs**

13

Defendant Merritt argues she is entitled to summary judgment because the undisputed

14

facts demonstrate that she provided Plaintiff with appropriate medical treatment for his injured

15

right hip that met the standard of care.  (Doc. No. 73 at 11-12).

16

The undersigned first must consider whether Defendant Merritt, as the moving party, has

17

met her initial burden of showing *prima facie* entitlement to summary judgment on the issue of

18

Plaintiff's deliberate medical indifference claim.  *Celotex Corp.*, 477 U.S at 323.  The *prima facie*

19

elements of a deliberate medical indifference claim are (1) a "serious medical need [where the]

20

failure to treat a prisoner's condition could result in further significant injury or the unnecessary

21

and wanton infliction of pain" and (2) the defendant's "response to the need was deliberately

22

indifferent."  *Wilhelm*, 680 F.3d at 1122 (internal quotation marks and citation omitted).  The

23

second prong is satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's

24

pain or possible medical need and (b) harm caused by the indifference."  *Jett*, 439 F.3d at 1096

25

(internal citations omitted).

26

Defendants do not dispute that Plaintiff was suffering from a serious medical condition

27

related to his right hip, including avascular necrosis of the joint.  Thus, Plaintiff meets the

28

objective prong of the deliberate medical indifference analysis.  *See Wilhelm*, 680 F.3d at 1122

18

1    As to the subjective prong, Plaintiff alleges that Defendant was among the various CDCR
2    medical providers who evaluated him on multiple occasions and were aware of his hip pain and
3    decreased mobility, but nevertheless failed to ensure that he received hip replacement surgery.
4    (*See generally* Doc. No. 25 at 21-23).

5    However, the record evidence in this case provides no support for Plaintiff's claim that
6    Defendant Merritt was deliberately indifferent to Plaintiff's serious medical needs.  Merritt saw
7    Plaintiff on 10 occasions between December 2018 and August 2021.  (*See* Doc. No. 73-4 at 4-11).
8    During that time Merritt never refused to see Plaintiff, nor did she express that she failed to take
9    seriously Plaintiff's complaints of right hip pain and loss of mobility.  Instead, she changed his
10   pain medication when Plaintiff's prescribed medication was no longer effective, (*id*. at 5 ¶ 17),
11   referred Plaintiff to physical therapy multiple times, (*id*. ¶¶ 18, 20; *id*. at 6 ¶ 22; *id*. at 9 ¶ 32; *id*.
12   at 10 ¶ 35), offered to order Plaintiff a wheelchair, (*id*. at 5 ¶ 20), increased Plaintiff's pain
13   medication in response to his complaints, (*id*.), followed up on the existing RFS for Plaintiff to
14   receive hip surgery, (*id*. at 6 ¶ 21), ordered orthopedic surgical evaluations of Plaintiff's hip and
15   referred him for surgery multiple times, (*id*. ¶¶ 22, 23; *id*. at 7 ¶ 25; *id*. at 9 ¶¶ 31, 33, 34; *id*. at 10
16   ¶ 36; *id*. at 11 ¶ 39), requested a CT scan of Plaintiff's hip, (*id*. at 8 ¶ 27) and ordered X-rays of
17   Plaintiff's hip (*id*. at 11 ¶ 40).  Finally, it is undisputed that Merritt had no authority to approve
18   Plaintiff's requests for hip replacement surgery and that only the SMART committee could do so.
19   (Doc. No. 73-4 at 2 ¶ 5).

20   Defendant's medical expert, having reviewed Plaintiff's medical records including the
21   notes of his appointments with Merritt, concluded that Merritt's medical decisions were at all
22   times appropriate and consistent with the standard of care.  (Doc. No. 73-7 at 4-5 ¶¶ 10-13, *id*. at
23   6-7 ¶¶16-17).  Indeed, the undisputed facts support the clear conclusion that Merritt was at all
24   times diligent in attending to Plaintiff's medical concerns within the limits of her authority,
25   including performing physical examinations, ordering treatment and tests, adjusting Plaintiff's
26   medications, discussing the plan of care with plaintiff, and submitting and following up on
27   requests for higher levels of care.  (*See generally* Doc. No. 73-4).  In response to Defendants'
28   Motion, Plaintiff did not submit any evidence to refute these claims.  The only evidence in the

record purporting to dispute these facts is Plaintiff's First Amended Complaint, which merely notes certain dates that he saw Defendant Merritt for medical treatment and then asserts, without citing any specific facts, that Merritt and other Defendants are responsible for his prolonged pain and decreased mobility.  (*See* Doc. No. 25 at 21-23, 26).

A verified complaint may serve as an affidavit for purposes of summary judgment if it is based on personal knowledge and if it sets forth the requisite facts with specificity.  *See Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc) ("A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence.").  Here, however, a self-serving declaration does not always create a genuine issue of material fact for summary judgment: The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence.  *See id.; see also F.T.C. v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th Cir.1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").  Here, Plaintiff fails to provide any supporting evidence for his claims as to Defendant Merritt.  He merely notes the dates that he saw Merritt for medical care and concludes that she, along with other Defendants, are responsible for the pain and reduced mobility he suffered as a result of not receiving hip replacement surgery.  (*See* Doc. No. 25 at 26).  Plaintiff provides inadmissible conclusory statements, rather than detailed facts that can create a genuine issue of material fact.  Meanwhile, the overwhelming, undisputed evidence demonstrates that Merritt provided attentive care throughout her treatment of him, advocated for him to receive hip surgery; the fact that the surgery was not approved was not due to any lack of diligence on her part.  Thus, there is no genuine dispute of material fact that Merritt was not deliberately indifferent to Plaintiff's serious medical needs and thus Merritt is entitled to summary judgment on Plaintiff's Eighth Amendment deliberate medical indifference claim.

**F.  The Undisputed Facts Show Defendant Cryer Did Not Act with Deliberate Indifference to Plaintiff's Serious Medical Needs**

Defendant Cryer asserts that he is entitled to summary judgment because the undisputed

facts demonstrate that he was not deliberately indifferent to Plaintiff's serious medical needs, and indeed was not involved in Plaintiff's medical care.  (Doc. No. 73 at 18-22).

Defendants' briefing contends that Plaintiff's claim as to Cryer is best construed as a supervisory liability claim, based on Cryer's role as the Chief Executive Officer at SATF and/or as the supervisor who approved the response to Plaintiff's first-level health care grievance regarding his hip injury.  (*Id*. at 18-21).  Because it is undisputed that Cryer was not directly involved in Plaintiff's medical care, the Court agrees with Defendants' framing of the claim as premised on supervisory liability.

Liability under section 1983 arises only upon a showing of personal participation by the defendant.  "There is no *respondeat superior* liability under section 1983."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) (citations omitted).  A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations or knew of the violations and failed to act to prevent them.  *Id*., *see also Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011).

Because there is no *respondeat superior* liability under section 1983, in order to survive summary judgment on his Eighth Amendment claim against Cryer, Plaintiff must establish a genuine dispute as to whether Cryer participated in or directed the violations of Plaintiff's rights or knew of the violations and failed to act to prevent them.  The undisputed facts demonstrate that Cryer did neither.

Indeed, as set forth above, the Court finds no genuine dispute that there was no underlying constitutional violation by Cryer's subordinate, Nurse Merritt.  Thus, there can be no supervisory liability claim as to Defendant Cryer.  *See, e.g., Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) ("Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred."); *see also Guinn v. Sturm*, 2011 WL 5508928, at *10 (E.D. Cal. Nov. 9, 2011) ("Because the undisputed facts establish that there was no underlying constitutional violation for deliberate indifference to Mr. Guinn's serious medical needs, Sheriff Muller cannot be held liable for his alleged failure in supervising Deputy Sturm and Officer Bigham"), enforcement granted, 2013 WL 1819831 (E.D. Cal. Apr. 30, 2013).

1        Nor does Cryer's involvement in the review of Plaintiff's institutional level health care

2  grievance provide a valid basis for liability.  Inmates lack a constitutional right to a specific

3  grievance procedure and there are no constitutional requirements regarding how a grievance

4  system is operated, even if a plaintiff believes the process to be unfair or not accurate.  *See*

5  *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann v. Adams*, 855 F.2d 639, 640 (9th

6  Cir. 1988).  Thus, Defendants Cryer's role in Plaintiff's health care grievance process is not a

7  legitimate basis for liability under § 1983, even if Plaintiff believes that Cryer wrongly denied his

8  health care grievance.  *See Penton v. Johnson*, 2019 WL 6618051, at *6 (E.D. Cal. Dec. 5, 2019)

9  ("[m]oreover, a prison official's denial of a grievance does not itself violate the constitution….

10  'An allegation that a prison official inappropriately denied or failed to adequately respond to a

11  grievance, without more, does not state a claim under § 1983.'") (quoting *Evans v. Skolnik*, 657 F.

12  App'x 285, 288 (9th Cir. 2015), *cert dism'd*, 136 S. Ct. 2390 (2016) (unpublished opinion))

13  (other citation omitted).

14        Finally, as the undisputed facts establish, Cryer is not a medical professional, has no

15  medical training, had no authority to order or approve the various requests for Plaintiff to undergo

16  hip replacement surgery, and no authority or basis to direct or countermand a physician's plan of

17  care for an inmate.  (*See generally* Doc. No. 73-3 at 2-5; see also Doc. No. 73-4 at 2 ¶ 5).  Cryer's

18  role at SATF was "administrative and operational, not clinical," including ensuring that the Chief

19  Medical Officer and Chief Nursing Office were performing their functions properly.  (Doc. No.

20  73-3 at 2 ¶¶ 6-7).  There are no facts to suggest in the record to suggest he failed in any of these

21  duties, nor that he failed to provide proper oversight of the health care grievance review process.

22  Thus, there is no factual basis on which to find that Cryer was deliberately indifferent to

23  Plaintiff's serious medical needs.

24        Plaintiff did not submit any briefing articulating any factual or legal basis for rejecting

25  these conclusions, nor does Plaintiff's First Amended Complaint provide any basis for doing so.

26  The only mention of Defendant Cryer in the FAC is in reference to his role in reviewing

27  Plaintiff's first-level of grievance (Doc. No. 25 at 19 ¶ 24), and conclusory statements asserting

28  liability generally as to Defendant Cryer along with other SATF staff (*see, e.g., id*. at 11

1  ("Defendant C. Cryer (CMO), L. Merritt (NP), G. Ugwueze (CME), K. Phui (P&S), C. Nyenke

2  (CP&S) . . . should have known Plaintiff's rights were being deprived[,] evidence of the

3  recommendation for surgery were in plaintiff's medical file and records and was aware for [sic]

4  the   need for surgery."). Accordingly, the Court finds it undisputed that Defendant Cryer was

5  not deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth

6  Amendment and grants summary judgment as to Cryer.

7        **G.  Qualified Immunity**

8        In the alternative, Defendants assert that they are entitled to qualified immunity in this

9  case. A government official is entitled to qualified immunity under Section 1983 unless (1) the

10  official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his

11  conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589

12  (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457 U.S.

13  800, 817 (1982). To demonstrate that a right was "clearly established" requires a showing that

14  the statutory or constitutional question was "beyond debate," such that every reasonable official

15  would understand that what he is doing is unlawful. *Wesby*, 138 S. Ct. at 589; *Vos v. City of*

16  *Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018). This standard is "demanding" and protects

17  "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at

18  589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[A] court typically should identify a

19  case where an officer acting under similar circumstances as [the defendant] was held to have

20  violated the constitutional right at issue." *S.B v. County of San Diego*, 864 F.3d 1010, 1015 (9th

21  Cir. 2017)). "Even when no case is 'directly on point,' courts may compare relevant factors to

22  determine whether every reasonable officer should have known the conduct in question was

23  unlawful." *Anderson v. Virga*, 2018 WL 1556806, *2 (E.D. Cal. Mar. 30, 2018) (citing *Isayeva v.*

24  *Sacramento Sheriff's Dep't*, 872 F.3d 938, 946-47 (9th Cir. 2017). The plaintiff bears the burden

25  of establishing that the right alleged was clearly established. *Moran v. Washington*, 47 F.3d 839,

26  844 (9th Cir. 1998).

27        Here, the Court found, as discussed above, that Plaintiff did not satisfy the first prong of

28  the qualified immunity analysis as to either Defendant Merritt or Cryer because neither

1   committed a violation of Plaintiff's constitutional rights.  Thus, the Court need not address the

2   issue of qualified immunity.

3          Nonetheless, as to Defendant Merritt's actions, Plaintiff has not shown the existence of

4   binding authority or a robust consensus of persuasive authority holding that a nurse in a

5   correctional facility must ensure that an inmate receives elective surgery which she is

6   unauthorized to approve.  It is Plaintiff's burden to establish that such a standard was "clearly

7   established" at the time of the incident, and he provides no argument whatsoever as to this critical

8   question.  Nor is the Court aware of any such right being clearly established at the relevant time.

9          Similarly, Plaintiff does not point to any legal authority holding that a correctional

10  executive, such as Defendant Cryer, must ensure that an inmate receives elective surgery which

11  he is not authorized to approve.  Nor is the Court of any such authority.  Here, Plaintiff fails to

12  meet his burden to show that the purported right in these contexts was "clearly established" at the

13  time of the incident.  Thus, the Court finds qualified immunity alternatively applies in these

14  limited contexts under the undisputed facts in this case.

15         Accordingly, it is **ORDERED**:

16         1.  Defendants Cryer and Merritt's Motion for Summary Judgment (Doc. No. 73) is

17             **GRANTED.**

18         2.  Judgment is granted in favor of Defendants.

19         3.  The Clerk of Court shall close this case.

20

21  Dated:    November 4, 2024

22                                              HELENA M. BARCH-KUCHTA
                                                UNITED STATES MAGISTRATE JUDGE
23

24

25

26

27

28